UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ELIXIR THERAPEUTICS, LLC, a Wyoming limited liability company,

        Plaintiff,

   v.

GLOBAL INNOVATIVE CONCEPTS, LLC, an Alabama limited liability company,

        Defendant.

Case No. 3:20-cv-2055-YY

AMENDED OPINION AND ORDER

On August 24, 2022, the court held a hearing on defendant's Motion for Partial Summary Judgment (ECF 62). As explained on the record, defendant's motion is denied as to Count I of defendant's counterclaim for breach of contract to the extent defendant alleges a contract was created through the parties' communications prior to the finalization of the written Compensation Agreement. However, the motion is granted as to Count I in that the court finds the written Compensation Agreement was a binding, valid, and enforceable contract, as plaintiff now concedes. *See* Answer, Ex. 1, ECF 1-1; Resp. 5, ECF 72. Moreover, based on the uncontroverted evidence in the record, plaintiff is in breach of the written Compensation Agreement. Regarding the extent of the breach, the parties agree on some things, but not on others, as discussed below.

1 – AMENDED OPINION AND ORDER

At the hearing, the parties agreed that defendant is entitled to a 50% share of gross sales proceeds after the costs that are set forth in paragraph two of the Compensation Agreement are deducted. They also agreed that mask costs equaled $1,300,000 and hazmat suit costs equaled $1,497,570. Additionally, since the hearing, the parties have stipulated that "costs and adjustments" for (1) "Shipping Reimbursement"; (2) "Trucking/Shipping"; (3) "Repackaging/Insurance"; (4) "Commission: PG"; (5) "Commission: JF"; and (6) "Legal/Accounting" total $271,293. Stamm Letter (September 13, 2022); *see* Stamm Decl., Ex. E, ECF 63-5. When these costs are deducted from the $6,200,000 in gross earnings, defendant's 50% share of sales proceeds would be $1,565,568.50.

However, plaintiff also contends that a "capital stack fee" of $150,000 and "capital stack participation" cut of 50% ($1,626,215) (totaling $1,776,215[1]) are costs that must be deducted before defendant is paid its 50% share of sales proceeds. Plaintiff argues that such costs are covered by the Compensation Agreement, which allows for the "costs of customary purchase order financing or reasonable financial costs associated with fulfilling a purchase order . . . and other ancillary costs related to performing and completing a Sales Transaction." Resp. 7, ECF 72; *see* Answer, Ex. 1, ECF 1-1.

---

[1] The sales to Georgia totaled $6,200,000. When the costs of the masks ($1,300,000) and hazmat suits ($1,497,570) are deducted, the remaining gross sales proceeds equals $3,402,430. Plaintiff claims that a capital stack fee of $150,000 and 50% cut of the remaining profits as a capital participation fee must be deducted as costs. When combined, the $150,000 (the capital stack fee) plus $1,626,215 (the capital participation fee, equal to half of the remaining profits after the capital stack fee is deducted) total $1,776,215.
   This calculation uses a different capital stack participation fee than the $1,496,593 reflected in the spreadsheet produced by plaintiff. *See* Stamm Decl., Ex. E, ECF 63-5. That calculation was based on costs for product that has seen been revised. But whether the capital stack participation fee is $1,496,593 or $1,696,215 does not affect the analysis.

2 – AMENDED OPINION AND ORDER

In his declaration, Martin Hudler, the "manager and 'Managing Director'" of Elixir, attests that Cavalini, a mask supplier, "demanded that $1,000,000 be placed in escrow as surety/guaranty for the masks being sold on credit in the event the State of Georgia rejected the masks and or the hazmat suits we were to supply." Hudler Decl. ¶¶ 1, 7, ECF 73.[2] Hudler worked with his ex-father-in-law to satisfy the financial requirements for this escrow demand, which he claims entailed a large amount of risk for himself and his ex-father-in-law. *Id.* ¶ 9. Hudler explains that if the purchase order was somehow defective or Georgia failed to timely pay or rejected the goods, which had happened previously in an order with another state, the supplier would have been able to demand payment from the escrow account, and Hudler and his father would have been "left holding the bag." *Id.* Thus, Hudler asserts, he "caused Elixir to agree to pay capital fees" in the amount of 50% of the gross profits "as compensation for the . . . added financial risk involved." *Id.* It is Hudler's "understanding that such a fee was normal and customary for financing purchase orders when the pandemic was in full swing, as [he] had worked with other purchase order financiers in the past, and . . . had been subjected to such rates." *Id.*

Hudler's testimony is corroborated to some extent by a document titled "Escrow Instructions of Escrow Agent | Instructions for Deposit and Disbursement," referred to internally as an "agreement," which was signed by Hudler (on behalf of Elixir) and Cavalini on April 15-16, 2020. Hudler Decl., Ex. 3, ECF 73. This document reflects that $1,000,000 was placed in escrow as a surety/guaranty, as Hudler attests in his declaration:

---

[2] *See also* Stamm Decl., Ex. D, ECF 63-4 (plaintiff's Amended Responses to Defendant's Second Set of Interrogatories, indicating masks and hazmat suits for the Georgia transaction were supplied by Cavalini and Red Rock Sourcing, LLC); *id.*, Ex. F (wire transfers to Cavalini and Red Rock on April 2020).

3 – AMENDED OPINION AND ORDER

> The Escrow has been opened with G&A and Client agrees to deposit via wire transfer One Million Dollars USD ($1,0000,000.) (the "Deposit") into the Escrow as surety/guaranty for Cavalini, Inc., a California corporation ("Cavalini") for extending credit to Client by way of allowing Client to ship 2 million 3 PLY Particulate Respirator Masks (the "Product") to the State of Georgia and more particularly to the Georgia Emergency Management Agency ("GEMA") without first paying Cavalini in full for the Product.
> Cavalini has agreed to ship the Product to the State of Georgia pursuant to that certain purchase order 42200-GEM-0000050317 (the "PO") issued to the Client (See Exhibit 1).
> Client agrees to fund the Escrow with the Deposit prior to the Product being shipped to GEMA as a surety/guaranty of payment to Cavalini in the event of a default whereby GEMA fails to accept the Product or pay in full the PO.

*Id.* at 1. The record also indicates that plaintiff thereafter made sizable monetary wire transfers to Cavalini in late April 2020, *see* Stamm Decl., Ex. F, ECF 63-6, and that Georgia received and paid for the products by May 11, 2020. See Kilgore Decl. ¶¶ 45-46, ECF 64; Stamm Decl., Ex. 3, ECF 63-3.

Under the Compensation Agreement, the capital stack fee and capital stack participation cut could be classified as "ancillary costs related to performing and completing a Sales Transaction," if not also a "financial cost associated with filling a purchase order." *See* Answer, Ex. 1, ECF 1-1. Moreover, a reasonable trier of fact could conclude that it was customary and reasonable for plaintiff to incur *some* cost to front the $1,000,000 surety/guaranty necessary to complete the Georgia sale. As Hudler noted in an April 8, 2020 email, "capital isn't free unfortunately."[3] Stamm Decl., Ex. F, ECF 64-6.

Defendant notes that the Compensation Agreement only allows for the deduction of costs "to the extent incurred," and argues that the "capital stack fee" and "capital stack participation"

---

[3] In that email, Hudler appears to be referring to a $.05 fee on each piece (i.e., 2,000,000 masks and 200,000 hazmat suits). But even that fee, which amounts to $110,000, comes nowhere near the combined capital stack fee and capital stack participation fee of $1,776,215 that plaintiff now claims are costs.

4 – AMENDED OPINION AND ORDER

cut were not incurred because Hudler and his father-in-law never actually received these fees. But Hudler testified that "[i]t was paid out partially" (although "not entirely"). Hudler Dep. 117:8-10, ECF 78-3. If plaintiff had a valid agreement with Hudler and his father-in-law to pay fees associated with fronting the surety/guaranty, then any unpaid amount that is still owing is analogous to an unpaid bill or debt for which plaintiff remains liable (e.g., an outstanding shipping invoice) and which constitutes a deductible cost, if permitted under the terms of the Compensation Agreement.

But, again, before any costs may be deducted, plaintiff must establish that the amount is customary and reasonable. On this record, there are serious questions regarding the reasonableness of the amounts requested for the capital stack fee and capital stack participation cut. In total, plaintiff claims that Hudler was to be compensated a $1,776,215 return on his $1,000,000 surety/guaranty. Even when broken down, the amounts do not appear any more reasonable. At $150,000, the capital stack fee amounts to a 15% fee for posting a $1,000,000 surety/guaranty for a period of only one month. And even considering the $6,200,000 in sales to Georgia, the capital stack compensation cut of $1,626,215 constitutes over 25% of that amount. Hudler's explanation for why such exorbitant fees are customary and reasonable is sparse—he does not explain the terms "capital stack fee" or "capital stack participation" or how such extraordinary amounts of compensation are customary and reasonable, other than to state that a fee of 50% of gross profits was "normal" and he had been subjected to such rates in other unspecified instances. Further, the Compensation Agreement contains no mention that Hudler, who owns a financial interest in plaintiff, *see* Hudler Decl. ¶ 1, ECF 73, would receive such a large additional percentage share of the sale proceeds, on top of the 50% that plaintiff was already receiving under the contract.

5 – AMENDED OPINION AND ORDER

Nevertheless, disputed questions of material fact remain as to whether the capital stack fees and capital stack participation cut constitute customary and reasonable costs permitted under the Compensation Agreement and, if so, what constitutes a customary and reasonable amount. While defendant has moved for summary judgment on its counterclaim for breach of contract, plaintiff's Complaint contains an outstanding claim for "[e]ntry of a judgment declaring the amount of money owed, if any and to whom, as between Elixir and Global," Compl. 3, ECF 2-1, and, on this issue, that remains to be determined at trial.

Defendant also moves for summary judgment on its alternative counterclaims for *quantum meruit* and unjust enrichment; however, defendant agrees that this portion of its motion is now moot in light of the court's ruling as to the existence of the Compensation Agreement.[4] As for defendant's motion for summary judgment on Count II of its counterclaims (Alabama Sales Representative Statute), the court reserves ruling until it hears further from the parties.

Finally, regarding defendant's Motion for Attorney's Fees (ECF 75), plaintiff filed no response and, at the hearing, confirmed that it had no objections. Therefore, that motion is granted. Fees and costs in the amount of $71,030.29 are awarded, and this order is immediately enforceable.

## ORDER

Defendant's Motion for Partial Summary Judgment (ECF 62) is granted in part and denied in part, as further explained on the record at the hearing and in this written order.

---

[4] Defendant's motion refers to Counts IV and V, but presumably, defendant intended to refer to Counts V (*quantum meruit*) and VI (unjust enrichment). *See* Answer ¶¶ 46-58, ECF 1; Mot. Summ. J. 1 ¶ 3, ECF 62 (moving for summary judgment on its "unjust enrichment and *quantum meruit*" claims). In the Answer, defendant also claims it is "alternatively . . . entitled to recover under a theory of equitable estoppel," but the motion for summary judgment appears to be silent as to that counterclaim.

Defendant's Petition for Costs and Attorneys' Fees (ECF 75) is granted and immediately enforceable.

IT IS SO ORDERED.

DATED  September 27, 2022.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge
